## SOUTHERN RAILWAY COMPANY *et al. v.* DICKSON.

1. In an action brought by a mother for the homicide of her son, where the original petition alleged in substance that the son contributed to her support, it was amendable by alleging that she was also dependent upon him for support. *Ellison* v. *Georgia Railroad Co.,* 87 *Ga.* 691 (13 S. E. 809).

2. Where, under the provisions of the Civil Code, § 5910 et seq., depositions of a witness are taken for use in a case pending, at the trial of such case the depositions so taken may, in the discretion of the court, be read in evidence, notwithstanding the presence of the witness at the trial. *Western & Atlantic Railroad Co.* v. *Bussey,* 95 *Ga.* 584 (23 S. E. 207).

3. One ground of the motion for new trial was, that, after the engineer of the train which killed the plaintiff's son had testified as to his experience as a locomotive engineer, and as to his observation as to the "way a moving train will pull a person," the court refused to permit the witness to testify as to "the manner in which a train in forward motion will pull or jerk such person catching hold of the same." As it does not appear from the ground of the motion what would have been the testimony of the witness on the point had he been permitted to testify, no point is presented for decision.

4. Inasmuch as this court holds that the plaintiff made out no case authorizing a recovery, considering the depositions to which objections were made along with other evidence in the case, it is unnecessary to discuss points raised in regard to their admissibility, especially in view of the peculiar facts and circumstances under which the objection and motion to exclude were made and the time of the making thereof, a situation which is not likely to arise again. If the depositions should be offered in evidence upon another trial, such proper objections as may be raised to them can then be passed upon, not complicated by the peculiar circumstances under which the ruling was made at the last trial.

5. Where one knowingly and voluntarily takes a risk of physical injury the danger of which is so obvious that the act of taking such risk, in and of itself, amounts to a failure to exercise ordinary care and diligence for his own safety, damages resulting from a hurt thus occasioned are not recoverable, although the same may be in part attributable to the negligence of the defendant.

JULY 11, 1912.

Action for damages. Before Judge Daniel. Fayette superior court. August 8, 1911.

*C. E. Battle, Howell Hollis,* and *Blalock & Culpepper,* for plaintiffs in error.

*J. W. Wise* and *R. R. Arnold,* contra.

FISH, C. J. Mrs. H. T. Dickson brought an action against J. A. Kenney and the Southern Railway Company for the alleged wrongful homicide of the plaintiff's minor son, Will A. Dickson. So much of the petition as is now material was as follows: "3rd. Petitioner further shows that Will A. Dickson was a son of your petitioner, being twenty years old and unmarried, and living with your petitioner and waiting on her, and contributing to her support and comfort and looking after her welfare. 4th. Petitioner further shows that she was entitled to the services and labor and association of the said Will A. Dickson, her minor son, your petitioner's husband and the father of the said Will A. Dickson being dead. 5th. Your petitioner further shows that she is a widow, and the said Will A. Dickson being the only minor son of petitioner and the only one whom petitioner had to live with her and protect her and labor and work for her."

The original petition was demurred to. One of the grounds of demurrer was that it did not appear from the allegations of the petition "that the plaintiff was dependent upon her son, wholly or in part, for her support." To meet this ground the 3rd paragraph of the petition quoted above was amended, over the objection of de-

fendants, by adding to such paragraph the following allegation:
"and ·upon whom your petitioner was dependent for support, your
petitioner being a widow with two girls living with her, and no
other man to work for and support her." The ground of demurrer
above stated was then urged to the petition as amended, and was
overruled, to which judgment the defendants excepted pendente
lite. On the trial at a subsequent term, a verdict was rendered in
behalf of the plaintiff; and the defendants' motion for a new trial
being overruled, they excepted, assigning error also upon the ex-
ceptions pendente lite. ' The petition alleged that the plaintiff's
son was killed about 5.20 o'clock p. m., on November .27, 1909, by
being run over by a freight-train on which the defendant Kenney
was engineer, at a public crossing over the track of the Southern
Railway Company in the city of Fayetteville, this State. Accord-
ing to the petition it was dark at the time of the homicide; the
engine was running backwards, pulling a regular freight-train hav-
ing a tender and cars in front of the engine, with no lights on
them, and no headlight on the engine. Other negligence alleged
in the petition was as follows: "Said engineer and said Southern
Railway Company did not slow up and slacken the speed of said
train so as to have the same under control as it approached the
said crossing, where the said Will A. Dickson was killed as alleged,
said train being run at said time at a rapid rate. of speed, to wit,
at a speed of 30 miles per hour, and did not slacken and slow up
and continue to slacken the speed of said train as it approached said
crossing, so as to have the same under control as the law requires
in such cases." The answer of the defendants denied the material
allegations of the petition. There was evidence in behalf of the
plaintiff, to the effect that there were two tracks of the Southern
Railway, one the main line, the other a side-track, crossing the
public crossing on which the plaintiff contended that her son was
struck and killed, at the time alleged, by a freight-train running
north on the main line, which was to the right, or east of the side-
track; and that the engine pulling the train was running back-
wards with the tender and a freight-car in front or ahead of it,
with no lights either on the engine, the tender, or the freight-car
in front; that the body of the deceased was found to the left or
west of the main line and near the rail on that side, about 20 or 30
yards north of the crossing, and there· were signs as if something

had been dragged along near the left rail of the main track from a point from 5 to 10 feet north of the crossing towards where the body was found, with a little blood on some leaves 4 or 5 feet further north from where it appeared something had been dragged. A piece of skull was found by the side of the track about 10 feet north of the place where the body was found. A witness for the plaintiff, who said he was a passenger on the train that killed plaintiff's son, testified: "It was kind of dark, and I recollect when it [the train] passed Hampton's crossing [whereon plaintiff claimed her son was killed]. It didn't blow for the crossing, and was running 30 or 35 miles an hour, as well as I can come at it." While there was some diversity in the testimony of the witnesses for the plaintiff as to whether it was dark at the time of the homicide, all of them who testified with reference to the train said that they saw the train as it approached the crossing. The plaintiff herself testified on this subject that "it was getting dark on the evening Will was killed," and that she saw the train before it reached the crossing, but could not see well enough to tell how the engine was running, whether backwards or forwards, because of the darkness. It does not appear from the record that any one saw the plaintiff's son at the time he was killed. Lindsay Pyron, a witness for the plaintiff, testified that on the day of the homicide the witness and a boy named Sam Ross left Fayetteville about sundown and drove a wagon across the railroad at the public crossing south of the depot, whereon the plaintiff contended her son was killed. As Pyron was the only witness for the plaintiff who saw the deceased immediately before he was killed, we quote all of his testimony that we deem material. He testified: "When we approached the crossing, Mr. Will Dickson hollered to me to hurry up and cross, that the train was coming, and I did hurry up and crossed. At the time that Mr. Dickson spoke he was standing. He had come down a little slant from his house, coming towards town. He was just coming up to the railroad. He was off of the crossing and coming to the crossing. He was coming from the house, going towards the crossing. He was in the big road when he hollered to me. When he called that the train was coming, I jerked up the lines and hit the mules and hurried across the track. Mr. Dickson went up on the track. He passed close to the wagon as we went over the railroad. He was going straight across the track. When

I looked up the last time and saw Mr. Dickson, I did not see the train. The train was right at me before I saw it, as close as that window, about 12 or 15 feet. I could not see it before. It didn't have any light on the train. The engine did not blow for that crossing. The train missed me about this far [indicating with his hands]. The wagon got fastened against the post at the crossing. I should say that it missed us 2½ feet. The last time I saw Mr. Dickson he was going over the right-hand rail. I don't know, don't remember, how far the train run before it stopped. In order to get away from the post, I had to back on to the track. . . As I have stated, when I last saw Mr. Dickson he was going up on the railroad. If he went up between the track and the embankment, I did not see him. I was whipping my mules when I saw him last, and the train was right on him."

On cross-examination he testified: "When I first saw Mr. Dickson he was standing in the road pretty close to the crossing, and this was when he called to me. At that time I was mighty nigh on the track. He said to me, 'Hurry up and cross; the train is coming.' I hurried and barely got across. He did not stand there. We crossed about the same time. I started to whip the mules, and they run and got across. The post to which the wagon was caught was the signpost standing by the side of the railroad and of the dirt road. I was sitting on the right of the wagon, driving. Sam Ross was sitting by me. He was on the side of the seat next to Mr. Dickson. . . I was doing all I could to keep the mules from running away and trying to keep the train from hitting me. I looked at Mr. Dickson because he was watching me to see that I got across. I hurried up, yes sir, he was afraid that I would be hit by the train, I guess that he was. He was hurrying me up to keep from being hit by the train. He was standing there urging me to go across as fast as I could, and me and him started across at the same time. The mules started to run from the side-track. At that time Mr. Dickson was right on the other side of the railroad, and was hurrying me to cross. He only spoke once and told me to hurry. He feared that I would get hit. After he told me, I got in view of the train. I could not see it at the time that he told me. I started from town that afternoon. I don't know how far it is from the square out to the crossing. I could not tell whether it was 300 or 400 or

500 yards, I have no idea. I left the square about sundown. It was dark right after sundown. It was night when the sun went down. I testified in this matter before, when my depositions were taken. In that examination I testified that Mr. Will Dickson was coming down a little slant from his house. I did not afterwards say that nobody was in the wagon with me. I never said that, because I knew somebody was in the wagon with me. I testified before that Mr. Dickson hollered to me and told me to look out, the train was coming, and that is correct. I stated in my former examination that at the time I was on the railroad. I was on the side-track. In answer to the question in my former examination, how come him to tell me to hurry across, I answered: 'He said that I didn't hear it.' That is a fact. He hollered and told me that the train was coming. This is correct, at that time the train was no piece from me. That was correct. Q. 'Did you look and see the train?' A. 'Yes sir, time I looked I saw it.' That answer I gave in my former examination, and it is correct. I did not look on the side-track, I looked when I was on the main line. It was not far when we got on the railroad. In my former examination I testified: 'He had not got on the track when he told me to hurry up. The mules were near to it, the wagon was not. I was going at a slow walk when he hollered to me.' That is the way it was. I then went across in a hurry. I was not frightened much. If I had been frightened, I would have jumped out of the wagon. . . When Mr. Will Dickson hollered to me to hurry up, I might have been 6 feet from the main line. I was on the west side of the side-track. He was standing pretty close to the crossing, and we started across the crossing at the same time. I saw the train when I was on the main line. I was driving to get out of the way. I was hurrying to get away from it, and he passed me and went on to the track. When he passed me I had got over the crossing, but the hind part of the wagon was not. He passed right by the wagon as I passed over the crossing. I do not know in what direction Mr. Dickson turned after he passed me. I do not know whether he passed between the track of the main line and the embankment. If he did I did not see him. I do not know what direction he took. The mules were trying to back in to the track, and I was whipping them to keep the train from striking the wagon, and while I was doing so I was not

noticing Mr. Dickson. I was not looking back. He had passed me before I got hung to the post. As I have stated, I was on the west side of the track when Mr. Dickson called me to go across, that the train was coming. In my former examination I stated that I was on the west side of the side-track when he called to me that the train was coming; and that is correct. Mr. Dickson had hurried me across, and after he had hurried me across he stepped on the track himself. . ᵧ. I whipped the mules to keep from being killed. . . I didn't hear it rolling. The train was sneaking up on me."

The theory of the defendants was that Will Dickson was not killed on the crossing but that he ran towards the north across the track in front of the train and endeavored to mount a box-car while in motion, and was thrown or fell from it and was killed. There was evidence tending to support this theory.

1-4. The matters dealt with in the headnotes 1-4 inclusive do not, when considered in connection with the statement of facts, need any elaboration. The grounds of the demurrer, other than the one ruled on, are clearly without merit, and call for no further discussion.

5. After a most careful examination of the evidence submitted in behalf of the plaintiff below, and viewing it in the most favorable light for the plaintiff, we are clearly of the opinion that it was wholly insufficient to support the verdict, and that the trial judge for this reason erred in refusing a new trial. Granting that the decedent was killed upon the public crossing, and that the defendants were negligent in not observing the law in reference to approaching it, the evidence of the plaintiff's witness, Pyron, which is fully set forth in the statement of facts, and which tends more strongly than the testimony of any other witness for the plaintiff to show that the homicide occurred on such crossing, clearly indicates to our minds that the plaintiff was not entitled to recover. From Pyron's testimony it is manifest that the decedent knew of the near approach of the train to the crossing. He was standing near the crossing in a position from which he could see the approaching train, so far as the evidence showed to the contrary. He was urging Pyron "to hurry up and cross—that the train was coming"—and "to go across as fast as [he] could." Pyron whipped his mules and hurried across the track—barely getting over—

the train missing the rear. of his wagon only some two and a half feet.   Decedent, though urging Pyron to hurry across, started to cross the main line himself from the opposite direction at the same time Pyron was crossing it, and passed close to the wagon as he went onto the track.   The last Pyron saw of decedent the latter "was going over the right-hand rail," which was the first rail he came to in crossing the main line.   The body of the wagon had not then passed over the main line.   Pyron had then seen the train.   Decedent must have then seen it also.    At all events, he was fully aware of its near approach before Pyron knew of it, as he warned Pyron of it, and urged him to hurry up· and get across as fast as he could, in order to avoid the train.   Decedent was bound to exercise ordinary care to avoid the consequences of the negligence of the defendants.   This he evidently failed to do.   He knowingly and voluntarily took the risk of injury to himself by attempting to pass immediately in front of the approaching train, the danger of the act being so obvious to him as to amount, in and of itself, to a manifest failure to exercise ordinary care for his own safety.   If the defendants were negligent in approaching the public crossing, such negligence was existing and must necessarily, from the testimony of Pyron, have been apparent to ·the decedent when he attempted to cross the track.   The rule is so well settled, by numerous decisions of this court, as not to need their citation, that if, after the negligence of the defendant commenced, the decedent became aware thereof, or by the exercise of ordinary care should have become aware thereof, and thereafter failed to exercise ordinary and reasonable care and diligence for his own safety, there could be no recovery.   While the question of ordinary care is, generally, to be determined by the jury, yet where, as in the case at bar, it is manifest from the evidence submitted in behalf of. the plaintiff that the decedent knew of the defendant's negligence, and thereafter not only failed to exercise ordinary and reasonable care and diligence for his own safety but voluntarily and recklessly took the risk of a danger that must necessarily have been obvious to him, then in such circumstances the court may say that there can be no recovery.   *Judgment reversed.   All the Justices concur.*